Good morning. Before we hear the first case this morning, we have a pleasant motion to entertain. Judge Shaw. Thank you, Judge Mayer. Yes, it is a pleasant motion. When I practiced in the court, I made numerous motions. I think they were all for extensions of time. And this is a much more, as the presiding judge said, pleasant motion. I would like to move the admission to the bar of the Federal Circuit, two of my clerks. And if they could rise. I move the admissions of Brian Patrick Boyd, who is a member of the bar in good standing of the highest court of Georgia, and Reeve Tyler Bull, who is a member of the bar in good standing of the highest court of New York. I have knowledge of their credentials and am satisfied that they possess the necessary qualifications for admission to the bar of the court. Those are the magic kind of official words that we have to say to make the motion, but I would just add as a small gloss that Brian and Reeve have been with me since last fall. They've both done an excellent job, and they've become good friends, and I'm sure that they'll be excellent members of the bar of the court if my motion is granted. Thank you. Well, absent dissent, your motion is granted, Judge Shaw, and I'll ask you both to face the clerk. Raise your right hand, please. Do you swear or affirm that you report yourself as an attorney in the conscience of this court, outrightly and according to the law of the United States Court of Appeals? No, sir. And I would like, on behalf of all my colleagues, to invite to welcome you to the bar of the court. We look forward to seeing you back here from time to time. The first case this morning is 071572, Linear Technology, the Advanced Analog. Mr. Davis. May it please the court. I'd like to address the Shapazy and the Casse references, and then turn to the interpretation of the term voltage regulator. Unless the court has any questions, I'll rely on the briefs for the other issues on appeal. Turning first to the Shapazy reference, and this is true with regard to both Shapazy and Casse. The Shapazy reference was not ruled on by the commission, and is not on appeal here. Neither Shapazy nor Casse teach the limitation of controlling the current flowing through the capacitor during both the charge and the discharge phase, i.e. when switches one and two are closed. The Shapazy patent only teaches the well-known prior art technique of controlling current through one of the phases. Shapazy lacks any disclosure of controlling current on alternating charge and discharge phases. Shapazy has one example of using multiple modulated switches. What did the ALJ rely on? Was it in column 5, line 20-25? That was one of the places the court relied on. There was column 4 and column 5. So you have here in column 5 and column 7. So turning first to column 5. If you look at that, it talks about in the illustrated preferred embodiment, only one switch is modulated. However, switch 1 and switch 4 may both be driven in such a manner. Now switch 1 and 4 both reside on the same line, so they both operate during the same phase. So having switch 1 and switch 4 modulated would not give you control of the current during both the charge and the discharge phase. And then the other alternative it gives is instead of doing 1 and 4, you could just do 1 or you could just do 3. So it never teaches having a modulated switch on both. What about column 7? Column 7, again, it talks about any of the switches. So again, you could just the idea that instead of 4, you could do 1 or you could do 2 or you could do 3. But it never taught having them on alternate sides so that you could control during both the charge and the discharge phase. But these are fact questions. What the reference teaches, and we owe substantial evidence deference to the ALJ. Isn't there some reasonable basis for his conclusion? No, Your Honor. Not given the standard of clear and convincing evidence. You have to have the requisite evidence. You need to meet that presumption. That was not shown here. And indeed, Dr. Schapese, the inventor for this patent, admitted that were you to alter to the disclosure to have control and current on both the charge and the discharge phase, you would have to add logic circuitry. And we cited that in our brief, Your Honor. So even the inventor and the other science expert conceded that you would have to modify what's there. There was also a heavy reliance placed on appeal with regard to the teaching of the additional clock phases. But remember, Your Honor, the claims here call for alternating back and forth between a charge and a discharge phase. And if you look at column 5, line 25, it notes that additional clock phases are added to produce multiple multiplications of the input voltage. In other words, what you do is you have a charge and you get to a certain level. You follow that by a charge so you can get to 1.5. You follow that by another charge so you get to 2. And so having more than two charges, having more than two phases, you're going to have charge after charge after charge and then a discharge. And that doesn't meet the limitation in the asserted claims of alternating between the charge and the discharge. What about CASE? So CASE, same issue, Your Honor. It also only teaches control during one of the phases. And CASE time and again talks about control of the current during the charge phase. It never mentions during the discharge phase. As Dr. Schapese conceded, it didn't exclude the discharge phase, they just didn't mention it. But not excluding is not the test for anticipation. And indeed, Dr. Schapese conceded that in the inverting charge pump embodiment, you shouldn't or couldn't control in the charge phase. Now, let me just ask you one question if I could. Looking at Claim 4, this limitation that you've been discussing with Judge Lurie, which one is that exactly? Yes, Your Honor. So for example, in the 531, so for example, if you look at, so you've got 4, which depends on 1, and then you've got controlling the first and second switches to alternately charge the first capacitor and discharge the first capacitor to the output node. And then in Claim 9, you have that same language, controlling the first and second switches to alternately charge and discharge. And then you have controlling the current when the first switch is closed, in other words, charge, and then you have when the second switch is closed, in other words, discharge. So you're saying those are the two limitations that you say are not found in Schapese? Schapese, possibly, it's Hungarian, so Schapese is, I think, probably the closest, but I know I'm mangling it even then, so I'll just say Schapese. That's fine, either way. But those are the two limitations that you say are not met in that reference. Right, now with regard to the multiple charge phase. So at the very least, the limitation that's not met is controlling current during both the charge phase, i.e. switch 1 is closed, and the discharge phase when switch 2 is closed. Now if you add multiple clock phases to that, then it wouldn't meet the alternating back and forth. You're asserting that there's no clear and convincing evidence, and we were talking about the deference, substantial evidence deference. Substantial evidence isn't a lot, and yet clear and convincing evidence is a lot. How do we mesh these two contrasting ideas? Your Honor, what you do is you look at the substantial evidence test through the rubric of the standard that was before the commission, the clear and convincing evidence. So they need to have substantial evidence that they've met the clear and convincing evidence. In other words, just some evidence to show that you have a lot of evidence. You provide deference to the court, but you only provide deference in the rubric of clear and convincing evidence, with the realization that after providing deference, you need to rest assured that they had before them the clear and convincing evidence of anticipation. And here, what we have is just this failure of a disclosure, and you have unsupported expert testimony trying to bridge that gap. But even there, the expert conceded in a number of critical areas where it simply wasn't there. Now for Casse, the main thing that the Appellee and Intervenor rely on is the dotted line in Figure 1 of Casse, and that's purportedly the feedback connection. But Casse describes the purpose of the feedback connection as controlling current during the charging phase, and that's at Column 3, Lines 18 to 27. Now despite that teaching, Dr. Schapese made the leap of faith that it denoted control not only during the charging phase, but also the discharging phase. He justified that leap of faith on the basis that the current source was in series with the capacitor during the discharge phase. But as he conceded at the hearing, that only meant that it could control the current during the discharge phase, and that's at JA 1887. Could control is not the standard with regard to clear and convincing evidence, particularly when you do not have the disclosure. He's saying it's inherently present. It has to be necessarily there. It has to necessarily occur. And remember, Your Honor, this is a case where the respondent has time and again said you can't find infringement just looking at the topology of the circuit. You need to see how it operates. Casse explicitly talks about that feedback loop as requiring, as being for the purpose of the charge phase. Now the Commission, in their findings, they do not issue necessarily, and that's at JA 156. But there is no evidence on record that this will necessarily happen. Dr. Schapese himself, the respondent's expert, conceded at 1887. I want to briefly address the claim construction voltage and your limited remaining time. Yes, Your Honor. Yes, and I'd like to address first the actual meaning of the term voltage regulator because I think it will help with the preamble. There are at least two problems. One is that they're limiting it to a single target level throughout the entire operating range of the device. And secondly, the Commission applied a standard where, although it was not explicitly in the construction, they required that the user specify that level. This narrow interpretation was not based on any disclaimer during the prosecution history or any language in the specification. Remember, the term voltage regulator does not appear in the specification. Rather, it's purportedly how one of ordinary skill in the art would understand it. But if you look at the art of electronics, which was cited by Dr. Schapese in his own patents to describe voltage regulators, the  regulators with multiple target levels and that can have their output voltage adjusted. So what happened is the Commission adopted a very limited interpretation that excludes the more sophisticated types of voltage regulators. The purported justification for doing that was a purported definition by Dr. Pedram, complainant's expert. In reality, there was no definition by either of the experts during any of the expert reports because this was an issue that was raised after that by AATI. Instead, Dr. Pedram had a snippet in there in the background of the technology. He noted that voltage regulators... How does the specification conflict with the ALJ's claim interpretation? The specification is written in a way that it contemplates possible variation in the output voltage. For example, the... In other words, there's nothing specific. There's nothing specific, but at column eight, for example, it talks of a maximum value for Vout. You don't talk in terms of a maximum value if there's only one value. There's other areas that talk about the possibility of variations in the voltage out and it talks about the voltage out generally being greater or less than, greater or equal to two times the voltage in. So it talks in terms of the possibility of alternation. Now, getting back to Dr. Pedram's statement, there was... Your Honor, I see that I'm down to two minutes. Go ahead. We'll give you your... We'll bring him back. Just to touch briefly on the Pedram statement, he noted that a voltage regulator eliminates variations in the input voltage to maintain a target value at the voltage. He never stated that it's limited to a single value. And he certainly... And stating that a voltage regulator's ability to regulate depends on the input voltage and the current load being within the normal specifications that the circuit is designed to work in, is by no means saying that you need to maintain a single value throughout the entire specified range of a product. Thank you, Your Honor. Mr. Bartoski, are you first? Good morning, may it please the Court. I'd like to start on the construction of the phrase voltage regulator determined by the Commission. It's a suggestion by counsel for linear that the ALJs and the Commission's construction is inconsistent with the specification. I think it's important to start with the specification's description of voltage regulation. And really, I think the most detailed one occurs at the end of Column 5, going into Column 6 of the specification. And this is actually cited in all the parties' briefs, that kind of long discussion of voltage regulation. And there's a similar summary on Column 9. There was a suggestion in Linear's brief that that passage, or those passages, allow for changes in the regulated voltage. And if you read those passages as a whole, and in particular the parts that were not highlighted in Linear's brief, it's clear that when they talk about the changes to the output voltage, yes, indeed they are talking about a change, but it's an instantaneous change that's detected by the feedback that then the circuit works to correct in order to, and this is how each of the paragraphs ends in discussing this, to maintain the voltage at the regulated value. So to the extent there's an argument that the patent doesn't contemplate that being one regulated output voltage, I think that's just not the case. Well, how about Line 52 in Column 5? V out equals V in minus 4 I L 38. Doesn't that indicate that the voltage out is proportional to V in, and therefore it's not necessarily constant? Well, I think, and there's a number of citations in the brief about maintaining the regulated value. As to that particular citation, I'd note that it occurs right before the discussion that all the parties agreed on, and there's no doubt that in these type of devices it does indeed raise the voltage by a certain amount, but I think that reading the patent as a whole, and indeed it starts really in the first couple paragraphs, they do talk about maintaining the regulated voltage, so to the extent that is inconsistent with it, I think it's important to read where they're really talking about voltage regulation. I have to, and I really think those columns where they discuss that are, as I said, Column 5 going on to Column 6. I'd like to ask you about anticipation. We are talking about clear and convincing. The ALJ seemed to point to some portions of SHPAZ that might be interpreted to anticipate. That doesn't sound like clear and convincing. Well, I think it's important, and the ALJ goes through this in his discussion. I believe it's roughly around JA 156. A lot of the dispute at the administrative hearing on this issue related to whether SHPAZ disclosed a switch. To the extent there's not a great deal of discussion, that's because there wasn't a great deal of argument presented about whether SHPAZ did indeed disclose this, but getting to the clear and convincing evidence, when you read SHPAZ, I think there's two important passages, linear points a lot to the one disclosed embodiment, but before they begin discussing the specific embodiment, and Your Honor pointed this out, on Column 4, they discussed that additional switch drivers could be employed during any of the clock phases, Theta 1 through Theta N. There's agreement between the parties that the charge and discharge phases are Theta 1 and Theta 2. Linear makes an argument that Theta 1 through Theta N somehow doesn't include both the charge and discharge phases, but 1 through N clearly includes both 1 and 2. Again, then he even says specifically, for the sake of clarity, I'll only discuss control on one phase. He does indeed, in discussing that embodiment, only discuss control in one phase, but he makes it clear again on Column 7, and this is from roughly Lines 29 to 36, that there's just a specific embodiment, and he says, although in the embodiments disclosed, the switches SW1, SW2, and SW3 are conventionally driven, and the switch driver is in response to feedback from the charge. When you're talking about a reference anticipating a claim, you're talking about the invention of the claim being described in a patent. Here we're talking about a couple of lines on Column 5, a few lines on Column 7, which you're having to interpret.  Even convincing? Well, absolutely, Your Honor. You know, the standard isn't that there be a lot of discussion, just that it be clear, and I think in looking at the Schapese reference, all the parties would agree that if you modulate a switch, switch 2 or switch 3 in addition to switch 4, that would be on the opposite phase. Then you would have this, and I think the critical question is whether they clearly disclosed that to one of ordinary skill in the art. Now, there was expert testimony supporting the fact that it did, but I even think standing here and reading when he discusses how you could modify this, he clearly explains that you could modify it to have control in both. This is particularly so if you look at Figure 1, you'll see that SD4 there, that would be an additional switch driver, and you see it even comes off of, you see SD4 comes off of Theta 1 as opposed to SD3, which is the block that provides the modulation disclosed in the preferred embodiment. So that's Theta 2, which would be the charge phase. Theta 1, the discharge phase, even says SD4, and it has it coming off of there. So in looking at this, it's clearly contemplated, and I think the critical issue is whether it's disclosed to one of ordinary skill in the art, not that it be in the preferred embodiment, and indeed that was, I think it was with respect to the Casse reference, but that was one of Linear's expert's arguments that, well, that's not an embodiment of the patent, but the key question here is whether it's disclosed by the reference, and with respect to both of these, we feel it was, and we feel we've met the clear and convincing evidence standard. I see I'm running out of time, so I think I may just defer if there's no further questions. All right. Thank you, Your Honor. Director Marshall. May it please the Court. Andrew Thomas of Deckard on behalf of the Intervenor ATI. I just want to step back a second and just focus on the big picture. There are multiple reasons why this Court should affirm the finding of no violation of Section 337. The first is under any claim construction, there are multiple factual findings of non-infringement, and the second is there was a factual finding that there was no domestic industry, and the third is there was a factual finding, again supported by substantial evidence, I'll get into a little more detail. The CEPESI reference anticipates all three asserted claims, and then there's a factual finding of anticipation by the CASA reference of Claims 4 and 26. Turning to, I'll first turn to the claim construction issue that Judge Lori raised on Column 5, the formula. The claim construction issue would control all the others you say are beyond doubt, right? That is. In other words, if it's wrong, then some of those would fall, wouldn't they? Or at least would have to be sent back. Some would, some wouldn't, and it would not require remand. On the question of, which has not been addressed here today, and I think the briefs stand very well, whether the preamble is limiting, that would only take the preamble out, there would still be anticipation, because anticipation did not rely on the preamble question by both references. If the preamble is in, and then it's a question of what does voltage regulator mean, under both parties' construction, there is non-infringement. And that's because even in their brief, the blue brief at 37, they said voltage regulator requires a predetermined regulated output voltage. There were factual findings by the ALJ that the output of the accused products was not a predetermined output, and there were factual findings by the ALJ that it was not a regulated output. And then on domestic industry, again, there were factual findings that there was no predetermined output and no regulated output. So even under their construction of the term voltage regulator, there are factual findings supported by substantial evidence. And, of course, remand wouldn't be appropriate, because anticipation would require a finding of no violation of Section 337. Turning to Judge Lori's question about Column 5, the formula there, it does not indicate a varying output voltage. In fact, nowhere in the patent does it ever say the output voltage can vary. There are numerous references to a singular regulated voltage. That formula and the description in the patent has as one of the variables minus 4IL, which is the load current, times R38, which is the adjustable resistance. The patent then explains that when the load current changes, and load current can vary depending on how much power you're pulling through, the resistance R38 will change to actually counterbalance that. So they're inversely proportional. If IL goes down, R38 goes up, and vice versa. So the Vout will actually stay the same. And I'm just going to mention a few of the references that are in our brief to the patent that says that the device is designed to, quote, maintain the output at the regulated output voltage. That's in the abstract. It's in the summary of the invention at columns 1, lines 52 to 54. It's at column 3, 59 to 60. Column 6, lines 22 to 23. Column 6, line 31 to 32. Elsewhere in the patent it says the output voltage remains at the regulated output voltage. It's column 3, line 48. And elsewhere it says the output voltage stays regulated, implying it's constant. That's column 6, line 45. And then elsewhere it says the circuit regulates the output voltage to a predetermined value. A predetermined value is singular. There's no discussion of multiple values or floating voltage. And the important thing here on the claim construction that they raise, the argument of this art of electronics that they cite to, that art of electronics is inconsistent with the part of the specification I just discussed. It also was never raised below. The art of electronics, the book was introduced for a different proposition, but it was raised for the first time in their reply brief. The art of electronics actually discusses changing the actual circuit. You rip out some resistors off the circuit board and put in new resistors to get a new regulated voltage. But once that circuit is operating, that regulated voltage is constant. So once you have the circuit, it provides a constant regulated voltage. You can provide a different constant regulated voltage if you rip off the resistors and put on different resistor values. Turning to the Zepezi reference, I just want to go through that briefly because I think counsel described figure 1 very accurately. At column 4, where everyone was referring, it says, it first describes SD3, which is the switch driver for the modulated switch SW4. And it describes how that can control current. And then at column 4, line 43 on it says, further additional switch drivers, SD4 item 17, like SD3, 16, could be employed during any of the clock phases, theta 1 to theta N, to provide additional modulated drive signals. If you look at figure 1, just like counsel said, SD4 item 17 is in theta 1. That is the charge phase, and theta 2 is the discharge phase. So it is actually explicitly teaching modulating the current in both the charging and the discharging. There is also an accusation in the reply brief that this was a new argument raised for the first time on appeal. That is not true. The ALJ actually had a whole discussion of it, and that is at JA 158 to 159. There was expert testimony on this exact point, JA 1373 to 78. There was argument in the pre-trial briefs and post-trial briefs, JA 4981. And there was actually an invalidity claim chart introduced into evidence cited by the ALJ that is JA 11756. So turning to the CASA reference, in the CASA reference I looked at the joint appendix page that Mr. Davis just cited and Dr. Sepezi said that it is controlling, not co-controlling, it is controlling. What happens if you look at page 62 of the green brief, that controllable current source is getting feedback. The patent specifically says it is getting feedback based on the amplitude of the output voltage. It is then in series during both the charge phase and the discharge phase, and we had color-coded diagrams that are at page 62 of the green brief, and those show in the embodiment of Figure 1 that that controllable current source is in the circuit loop during both charge and discharge. There is another whole embodiment in the patent, that is the inverter that Mr. Davis talked about. During that embodiment, it is only controlling during one of the phases. But in Figure 1, in that embodiment described in the patent in Figure 1, it was clearly in both the charge and the discharge phase. And there was substantial evidence supporting the ALJ's finding there. I see I'm a little over time. We're giving you as much time as we're giving him back if you need it. Unless the court has any questions, I think I've covered all the issues. Thank you. Mr. Davis. Your Honor, just a few points. If we could turn to JA 1887 with regard to the testimony of Dr. Sepezi. The answer starts at line 12, and it says, So anybody with ordinary skill in the art would understand that because the current source is in series with the capacitor during discharge phase, it can control the current during the discharge phase. Can, Your Honor. Question. But it doesn't actually show this. When you call the feedback loop controlling the current during the discharge phase, right? Answer. This feedback loop doesn't show at what phase you control it. It signifies control. Your Honor, Dr. Sepezi's testimony is clear that CASE is not clear with regard to control during both the charge and the discharge phase. Mr. Davis, even if you don't lose on validity, what about infringement? Your Honor, what we need to win on is that the interpretation of voltage regulator was an error. And the anticipation of Sepezi and either controlled resistance. What if we hold no, not invalid over Sepezi? We would also need to. But the commission also found no infringement. Right. Based on, remember, this is an agency decision. It's subject to Chenery. So it's not, you don't affirm on what could have happened. You affirmed on what the commission actually decided. So if this court finds that the claim construction for voltage regulator is an error, then it should remand back for further proceedings. If this court finds that the commission correctly construed voltage regulators, we lose. Now, let's talk, with that segue, let's go back to voltage regulator very quickly. And, oh, I'm sorry, Your Honor. One other thing, there was an allegation that the art of electronics was newly raised. If you look at JA3119, I believe you'll see it in the petition for review as well. It was raised down below. I'm sorry. Let me go to voltage regulator. Your Honor, there are a number of references in the 531 patent that talks about A-regulated voltage. Sometimes it talks about D-regulated voltage. Sometimes it talks about A. Sometimes it talks about bearing. Your Honor, in describing how the circuitry works to maintain a particular target voltage, the 531 patent is by no means excluding the possibility that it also operate to maintain voltages at a regulated level for other targeted levels. Remember, the commission's decision here on voltage regulator was not based on any purported surrender of subject matter. By no means excluding is not a strong statement. Your Honor, two things. Claims are not limited to the preferred embodiment. What the patent is doing in the sections that they're discussing is they're talking about how to regulate the voltage for that particular target. But that's not the same thing as saying there's only one target. You will look in vain for any statement in the specification of the 531 that it's limited to a particular output voltage target. Remember the purpose of the invention.  Okay. Sorry, Your Honor. Remember the purpose of the invention here. The purpose was, and it's a charge pump that was able to reduce noise on the input line by controlling, maintaining a substantially constant current during both the charge phase and the discharge phase. That's what this invention is about. That's the point of novelty here. Again, remember, Your Honor, voltage regulator does not even appear in the spec. That's a term that the sole place it appears is in the preamble. And as we noted in our briefs, there are areas where the patent talks about a varying voltage output. So the mere fact that in some places it talks about, when it's talking about a specific target voltage, it's talking about maintaining, that's how you maintain the regulated voltage. That's not a disclaimer. That was never found to be a disclaimer by the commission. The commission was saying this is how one of ordinary skill in the art would understand it. The art of electronics shows. All right, sir. Thank you very much.